Good morning, I am Richard Ariake for the Petitioners in this case. The Petitioners in this case, Your Honor, believe the issue here to be whether or not they established past persecution or a well-founded fear of future persecution. The immigration judge in this case found that the respondent had testified quite credibly regarding her experiences in Brazil. The question then becomes whether or not she established sufficient harms to amount to persecution in this case. Now, this court has found that the adjudicator has to look to the cumulative effects of harms in deciding whether or not past persecution has occurred or whether or not there is future threat to future persecution. The petitioner in this case has lost her husband because she believes he's been abducted and killed by the police. Well, the problem with that, that's the basic, the heart of your claim, really, is that her husband was killed by the police because of his religion. But there's no evidence of any kind. All that we know is that her husband disappeared one day. That's correct, Your Honor. So how do we get from there to the inference that it was the police who killed her husband? You have to look to the experiences in the past, the attempts, various attempts made to secure an identification card for the husband. The altercation with the police outside the office. Is there any evidence in general that the police killed Sikhs? Is there anything in a country report or in the record anywhere that shows killings of Sikhs by police? No, Your Honor, there isn't. However, as the immigration judge pointed out, the Sikh religion is something that is rather obscure and not well known in Brazil. And the fact that their particular case was published in a news article, thereby causing some embarrassment to the police. But that was about eight years before he disappeared in a different part of the country, right? Yes, Your Honor, that is correct. However, the incident outside the police department occurred just four years prior to the disappearance. And from the record and according to the immigration judge's decision, the husband was never issued that identification card. And we do not know what other efforts he made or may have made to secure such. And the record is devoid of any information as to what impact that had on his ability to function in society, support his family. But I think there's circumstantial evidence to indicate that the police, for one, may have harbored resentment because they took their spirit. Being resentful and killing somebody is quite a large step. That is correct. Even if we disregard the husband's disappearance in this case, the petitioner in this case had a 10-year-old son at the time of the hearing. And he also is being raised or was being raised in Brazil as a Sikh. And we have the incident of the confrontation with two policemen basically telling the mother to cut the boy's hair and do away with the turban. In other words, forget about your religion and conform to the rest of society. Now, the mother had every reason to fear for the life of her son at the very least. And that would go to the... Well, nobody ever threatened her son. I mean, nobody ever hurt her son. Some police, two policemen were not very sensitive, let's say, and engaged in some acts of discrimination. There's lots of discrimination that goes on in many countries. But that's not a basis for asylum. It's got to be more than discrimination. It has to be persecution. Well, yes. The definition of... Well, actually, the act does not define persecution, Your Honor. So we have to look at the totality of the circumstances, the various incidents that have occurred in the lives of the applicant in this case, and consider whether or not she has a reasonable fear that she will be persecuted or, in her case, her minor son might be persecuted in the future. Her experience with her husband, I think, was sufficient to indicate to this petitioner that the life of her son would definitely be in danger as he grows up in Brazil in a society where Sikhism is not really a religion that is well-known. And even if policemen would tell a mother to remove her son's turban and cut his hair, that, I think, is enough to instill fear in any mother. All right. Do you want to save the rest of your time for rebuttal? Yes, Your Honor. Thank you, counsel. Thank you. Good morning, Your Honors. May it please the Court, my name is Debbie Messier and I represent the Attorney General. This is an asylum case in which the immigration judge denied relief because Ms. Chandok failed to show either past persecution or a reasonable fear of future persecution on account of her Sikh faith in Brazil. Because substantial evidence in the record supports the immigration judge's denial of relief and does not compel a contrary decision, we ask the Court to deny the petition for review. In this case, Ms. Chandok failed to satisfy her burden of proof to show that she is a refugee. She claims to have suffered past persecution and have a well-founded fear of future persecution by the federal police in Brazil on account of her faith. I'd like to address the central issue in this case, which is whether the harassment suffered by Ms. Chandok in Brazil, while unfortunate, whether or not it rises to the level of persecution required to establish her eligibility for asylum. Ms. Chandok testified to three incidents of harassment. She said that in 1984, when she and her husband, who was Sikh and who had moved with her to Brazil, went to the federal police office, they refused to accept his photos because he was wearing a turban, and there was a federal police directive that requires individuals to have a bare head in their photos. She and her husband were upset by him being required to remove his turban, which he didn't, and they talked to a news reporter who published an article in the paper later on about the incident. She then testified that in 1988, a few years later, she again went back to the federal police office, again seeking an identity card. Her husband and her were initially admitted to the building. Her husband left the building for a drink of water, and when he returned close to the closing time of the building, he was denied reentry, and a scene ensued with him and the police officers at the front of the building. The police officers grabbed him, and he shouted for his wife, and she came and the two police let him go. Finally, she says that in 1996, four years after her husband disappeared without telling her where he was going, she was walking downtown, presumably in Sao Paulo, and two policemen asked her whether she was the wife of the Sikh who had refused to remove his turban and also made a rude comment to her child and said or made a rude comment about her child and said that the child should be forced to take off his headkerchief and cut his hair and be a normal child like other children. And on the basis of those three incidents, Ms. Chanduk seeks asylum in this country. Your Honors, this Court has held that persecution is not mere unpleasant, unpleasantry, not mere harassment or discrimination, as Your Honor pointed out, and for that reason, the incidents she described simply do not rise to the level of persecution, do not make her eligible for asylum. With respect to the question on the disappearance of the husband, there is absolutely no evidence in the record to support her belief that her husband was abducted by the police. In fact, the evidence is to the contrary, frankly, because the two police officers who saw her four years after her husband disappeared asked whether she was the wife of the Sikh individual. Presumably, they didn't know he was disappeared or not around anymore. So that would actually sort of cut against her belief. Well, that seems odd that four years afterwards, the police officers would remember that there was an individual who didn't take his turban off. That doesn't really suggest that they thought he was still alive. If they knew that much, you'd think they'd know he disappeared. That's certainly one way to look at it, Your Honor. It might give you some concern if you thought the police were that aware about your husband, that years later they remembered he was the one who didn't take his turban off, and that was still something that bothered them deeply. If the police are an entity, they'd be feared in that community. Yes, Your Honor. Again, there was a newspaper article published about this individual, and there aren't many Sikhs in Brazil, so it's perhaps not surprising that they knew who she and her husband were, given the fact that— Wasn't the article published many years before that in another part of the country? It was published in another part of the country, but— And these police still remembered that years later? Perhaps they did, Your Honor, because of the unusual nature of the incident and because it may have caused them some embarrassment publicly. It might be reasonable to think they remember that. But if you thought the police were still concerned eight years later that your husband had embarrassed them, and if the police were feared generally in the country, you might have some reason to fear that they were going to be after you. Your Honor, certainly one might have fear. The question is whether that's a reasonable fear of persecution. That's the question before the court. But what is the general reputation of the police in Sao Paulo? Well, the country reports indicate that these are, keep in mind, federal police officers, not local police officers. And the country reports indicate that they do sorts of administrative-type things, like running this identity card program. The country reports do not indicate that they're feared or they engage in the disappearance of individuals, or that that seems to be a pattern with these folks. Well, it says, I think, in the record that in Sao Paulo, police were responsible for extrajudicial killings of 45 persons in just the part of 1998. Is that right? Yes, Your Honor. I believe that reference is to the local police, not necessarily the federal police. I think the police that she has been talking about, she talked about in her asylum application, are a different office. I mean, they would probably be analogous to, it would be like talking about our local police versus federal law enforcement agents. These individuals were concerned with her only because of the identity card issue. There's no indication that these were local police officers who might engage in rogue activities. I had a question I wanted to ask you. Yes, Your Honor. Is it true that the government deported the Petitioner before this argument? I'm sorry, Your Honor? Have you deported this Petitioner already? Frankly, Your Honor, I'm not sure. I don't recall. I don't know whether we've deported him or not, her or not. The information that reached us that she was gone. Okay. And I should think it would concern you as much as it concerns us. It certainly would, Your Honor. I apologize. I actually did not brief this case in the last month. Would you look at it and find out and give us a report? Because it's outrageous to anticipate the outcome. Yes, Your Honor. I could certainly find out and would be happy to report that to the Court. Of course, Ms. Chandler is free to pursue her appeal from abroad. She's not. She is, but she's been deported. She's been subjected to a process she shouldn't have been subjected to. I'll be happy to find that out for the Court, Your Honor, and report that back to you. Are there any other questions, Your Honors? Thank you, counsel. Thank you. Thank you, Your Honor. Again, because the substantial in the record does not compel a contrary conclusion, we would ask the Court to deny the petition for review. Thank you. Good morning, Your Honor. I would like to take a minute to just clarify something. I do not know that the petitioner has been deported in this case. When I had spoken earlier to the court's clerk, I had indicated that I've been unable to locate the petitioner and that I have a few petitioners that some of them have been removed and some of them left on their own free will, but I was in the process of verifying, so I do not have any evidence. You don't know at the moment? Yes, Your Honor. I hear it. Now, regarding the – I guess the police that petitioner describes in her asylum application in 1992, I do not believe those were Federal police, because she said she was walking in the streets of Sao Paolo, and the record does not indicate that those were Federal police. Those are local police officers, and if they knew that she was – that there was a sick man who refused to take off his turban, then as the – as Your Honor mentioned a few minutes ago, it could be because of the newspaper article published or because they've kept an interest in this case. Now, I will reiterate. Persecution, according to this court, encompasses more than just restrictions or threats to life and liberty, and if this petitioner actually believed, held a subjective fear that her son's life was going to be in danger as he grows up, and if she testifies credibly to that, then she satisfies that subjective part of it. And when you look at the objective – the objective part of the – of her burden, when you look at the fact that the police in Brazil, there is widespread corruption, there's evidence that they've engaged in extrajudicial killings, and the petitioner had every reason to believe that they may have had a hand in the disappearance of her husband. Now, when police officers walk up to a lady walking with her infant – a minor son and literally tells her to stop his religious practice, there's a threat in there. And she has every reason to believe that his life is going to be in danger, just like his father's. And that is the basis for her claim. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted. Next case on the calendar for oral argument is Irons v. Carey. Thank you.
judges: Reinhardt, Noonan, Fernandez